# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Wind Logistics Professional, LLC
and Anthony Parson

                        **Plaintiffs,**

v.

Universal Truckload, Inc.,

                        **Defendant,**

Ace Doran, LLC, et al.,

                        **Counterclaim Defendants,**

_____/

Case No. 1:16-cv-00068

Michael L. Brown
United States District Judge

## <u>OPINION AND ORDER</u>

Counterclaim Plaintiff Universal Truckload, Inc. ("Counterclaim Plaintiff" or "Universal") filed a Second Motion for Partial Summary Judgment (Dkt. 115), and Counterclaim Defendants also moved for summary judgment (Dkt. 121). For the reasons below, the Court grants in part and denies in part each motion.

# I.    Background

Anthony Parson began working for Universal as an employee in 2003.[1] (Dkt. 131-1 at ¶ 1.) He helped coordinate the transportation and delivery of industrial wind equipment for one client, GE Wind Energy Outbound ("GE Wind"), a business unit of a General Electric Company. (*Id.* ¶¶ 2–4.) He created a network of truck owner-operators, working as independent contractors to carry GE Wind freight under Universal's motor carrier license. (Dkt. 119 at 14:7–10.) These drivers own and operate their own specialized transportation equipment used to transport over-sized loads.[2] (Dkt. 124 at 45:22–46:9.)

Parson and Universal changed their professional relationship in 2012. (Dkt. 123 at 38:4–6.) Parson became an independent contractor working exclusively for Universal. (Dkt. 131-1 ¶¶ 8–9.) He still coordinated transportation between Universal and GE Wind and managed the relationships between Universal, GE Wind, and the truck owner-operators. (Dkt. 123 at 43:16–44:21.) Parson created Wind

---

[1] Counterclaim Defendants contend that Universal hired Parson to start Universal's heavy haul division. (Dkt. 131-1 ¶ 1.)

[2] Counterclaim Defendants dispute that "all" of the drivers were owners/operators. (Dkt. 131-1 ¶ 2.)

Logistics Professional LLC ("Wind Logistics") to facilitate this work. (Dkt. 124 at 22:3–6.) Universal and Parson signed two contracts, the Agency Agreement and the Commissioned Agency Agreement ("CAA"). (Dkt. 123-1 at 5–11.)

Universal also loaned Parson $85,000. (*Id.* at 12.) In exchange, Parson agreed to represent only Universal for five years. (*Id.*) Universal also agreed to forgive the loan over a five-year period, forgiving one-fifth of the loan each year. (*Id.*) Parson agreed to repay the loan if he failed to meet revenue goals or began competing with Universal within five years. (*Id.*)

In 2013, Bennett Motor Express ("Bennett") agreed to lend Parson $500,000 if he ended his relationship with Universal and became Bennett's exclusive agent. (Dkt. 123 at 77:2–15.) Parson told Universal about the offer, and Universal agreed to match it. (*Id.*) Universal agreed to lend Parson the money and to forgive $100,000 each year so that it would forgive the entire loan after five years provided Parson kept working as Universal's exclusive agent. (*Id.*) The repayment terms shifted slightly depending on whether Parson stopped working for

Universal to work for a competitor or left Universal for other reasons. (Dkt. 123-1 at 13.)

Their arrangement worked well. Parson and Wind Logistics generated about $22 million in revenue in 2013, $32 million in 2014, and $40 million in 2015. (Dkt. 124 at 127:23–128:22.) In mid-2015, however, Parson became concerned about two policies that Universal proposed for the owner/operators. (Dkt. 123 at 55:2–56:17.) First, Universal sought to implement a pay-delay to new owner-operators of Parson's fleet. (Dkts. 123 at 57:20–24; 120 at 104:20–24.) Second, it wanted to charge drivers a surcharge on permits and escorts. (*Id.*) Parson feared these policies would make recruiting drivers difficult and decided to stop working with Universal. (Dkt. 124 at 40:2–17.) He signed a letter of intent to work with Bennett in November 2015. (*Id.*) In it, he agreed to work with Bennett's heavy haul division, Ace Doran, LLC ("Ace Doran"), to move equipment for GE Wind. (Dkt. 124-1 at 33–34.) The letter stated that Parson would begin working with Bennett on January 1, 2016. (*Id.*; Dkt. 124 at 41:15–21.)

Despite signing that letter with Bennett, Parson did not tell Universal that he planned to end their exclusive relationship. But, on

4

December 14, 2015, Mark Limback (Universal's President) heard from others in the industry that Parson already decided stop working with them. (Dkt. 120 at 115:1–12.) A Universal employee then sent text messages to Parson's GE Wind drivers telling them to contact Universal's "NEW AGENT" for all GE Wind shipments. (Dkt. 120-1 at 39.) Two days later, Universal representatives confronted Parson about his plan to end their relationship. (Dkt. 123 at 52:16–53:14.) On December 22, Parson finally told Universal that he was ending their agency relationship as of December 28. (Dkt. 123-1 at 14–15.) As planned, he began working with Bennett on January 1, 2016. (Dkt. 131 ¶ 62.)

Seventy-five of the eighty drivers with whom Parson had worked with at Universal followed him to Ace Doran. (Dkt. 123 at 87:20–88:1.) Universal's business with GE Wind also dried up, declining from $40 million in 2015 to $4.3 million in 2016. (Dkt. 120 at 45:6–19.) Ace Doran seems to have picked up that business as it had revenue exceeding $44 million in 2016. (Dkt. 124 at 128:20–22.)

The evidence shows that, before Parson notified Universal of his intent to end their relationship, he had extensive communications with Bennett, GE Wind, and his network of drivers about his intended move.

The parties do not dispute that these communications took place between September 2015 and December 28, 2015, though they dispute their legal significance. Parson, for example, provided Bennett and Ace Doran several documents about shipping windmill equipment. These documents consisted of

- the two-week schedule of loads GE Wind awarded to Universal (Dkt. 131-1 ¶¶ 49–52);

- Universal's 2016 blade allocation[3] (Dkt. 124 at 102:6–12);

- Universal's projected line of business, which shows Universal's prospective and retrospective awards from GE Wind (Dkt. 125 at 81:4–82:2);

- information on the trailers Ace Doran would need to perform the outbound heavy haul transportation of GE Wind's specialized blades and towers (Dkt. 124 at 141:4–142:5);

- pictures of Universal's blade trailers (Dkt. 125 at 22:1–14); and

---

[3] Bennett's representative testified that he never received the blade allocation. (Dkt. 131-1 at ¶ 76.)

- Universal's proposal to GE Wind for the purchase and repayment of blade trailers to support Universal's GE Wind business (*Id.* at 21:9–16).

Parson also helped facilitate drivers moving from Universal to Bennett. He sent Bennett a list of the drivers leased to Universal who were hauling GE Wind freight, including their addresses, dates of birth, and driver's license numbers. (*Id.* at 46:3–13.) [4] He also gave Bennett a copy of Universal's insurance materials that Ace Doran could use as a model for its own. (Dkt. 124 at 148:9–149:12) [5]

He also spoke with the drivers to facilitate their transfer to Bennett. He notified three fleet owners with contracts with Universal that he was leaving for Bennett as of January 1, 2016. (Dkt. 123 at 108:10–109:13.) He reassured a fleet owner that Ace Doran would have work for him once the drivers contracted with Ace Dornan. (Dkt. 124 at 96:3–11.) He personally contacted every single owner-operator and driver who hauled GE Wind outbound freight for Universal to notify them that he was no

[4] Counterclaim Defendants argue this information was not confidential. (Dkt. 131-1 at ¶ 64.)

[5] Counterclaim Defendants argue this information was not confidential. (Dkt. 131-1 at ¶ 65.)

longer comfortable with Universal and that he was leaving for Bennett. (*Id.* at 83:21–84:9.) He also provided Universal's owner-operators and drivers links in mid-December 2015 to an Ace Doran application, answered questions from drivers about differences "between the two companies… what is here versus there," and worked on plans to get drivers to attend Ace Doran's orientation so they could prepare to haul loads for Ace Doran. (*Id.* at 85:1–5; Dkts. 124 at 157:1–5; 125 at 60:4–25.)

Between the time he agreed to join Bennett and the time he notified Universal of his plan, he also spoke with GE Wind to facilitate his efforts to move its business to Ace Doran. During this time, he told GE Wind that he would be leaving Universal the same day that he signed the letter of intent with Bennett and that he would have "100% of the current fleet of owner-operators who were under contract with Universal." (Dkt. 124 at 166:16–20.) He began conducting business from an Ace Doran email account, including corresponding directly with individuals at GE Wind. (Dkt. 123 at 86:9–17.) Finally, he asked Ace Doran to get registered in GE Wind's computer system, presumably to make the transition easier. (Dkt. 123 at 138:20–139:22.)

Plaintiffs Parson and Wind Logistics sued Universal in January 2016 for breach of contract. (Dkt. 1.) Defendant Universal counterclaimed in its answer, alleging breach of contract, breach of fiduciary duty, and tortious interference with business relations. (Dkt. 2.) The Court permitted Universal to add Ace Doran, LLC, Bennett Motor Express, and Bennett International Group, LLC as Counterclaim Defendants. (Dkt. 91.) Here are two motions: Defendant and Counterclaim Plaintiff Universal's Motion for Summary Judgment; and Counterclaim Defendants Anthony Parson's, Wind Logistics, LLC's, Ace Doran, LLC's, Bennett Motor Express's, and Bennett International Group, LLC's (collectively "Counterclaim Defendants") Motion for Summary Judgment. (Dkts. 115, 121.)

## II. Legal Standard

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A moving party does this by showing "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. The movant, however, need not negate the other party's claim. *Id.* at 323. It simply must show a lack of dispute as to a material fact. In determining whether a movant has done this, the Court views the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996).

If the movant meets its burden, the nonmovant must show that summary judgment is improper by identifying specific evidence that raise a genuine dispute as to a material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, there is no

"genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id.* But "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48. The court, however, resolves all reasonable doubts in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

## III. Analysis

### A. Parson's Breach of Fiduciary Duty and Duty of Loyalty

Universal claims Parson and Wind Logistics breached the fiduciary duty and duty of loyalty they owed it. To sustain a claim for breach of fiduciary duty, a plaintiff must prove (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach. *See Perry Golf Course Dev., LLC v. Hous. Auth. of Atlanta*, 670 S.E.2d 171, 178 (Ga. Ct. App. 2008). Agents also owe a duty of loyalty to their principal. *S. Parts & Eng'g Co. v. Air Compressor Servs., LLC*, No. 1:13-CV-2231, 2014 WL 667958, at *3 (N.D. Ga. Feb. 20, 2014). But duty of loyalty claims must be based on a fiduciary duty owed by the employee

and "must rise and fall with any claim for breach of fiduciary duty." *Hanson Staple Co. v. Eckelberry*, 677 S.E.2d 321, 324 (Ga. Ct. App. 2009).

## 1. Existence of a Fiduciary Duty

Under Georgia law, an agent owes its principal a fiduciary duty. *See Smith v. Pennington*, 15 S.E.2d 727, 728 (Ga. 1941). An agency relationship arises "wherever one person, expressly or by implication, authorizes another to act for him." GA. CODE ANN. § 10-6-1. Agents can create obligations on behalf of the principal, bringing third parties into contractual relations with the principal. *See Physician Specialists in Anesthesia, P.C. v. Wildmon*, 521 S.E.2d 358, 360 (Ga. Ct. App. 1999). Agency relationships can be created through "law, contract, or the facts of a particular case." *Wright v. Apartment Invest. & Mgt. Co.*, 726 S.E.2d 779, 785–86 (Ga. Ct. App. 2012).

Counterclaim Plaintiff Universal argues that Parson/Wind Logistics had a principal-agent relationship with Universal created by both contract and Parson's/Wind Logistics's authority to bind Universal in contract. Universal claims this contractual relationship led to a fiduciary duty. Universal is correct. The contract between Parson and

Universal created an agency relationship.[6]  The parties entitled it "Commissioned Agent Agreement," designated Parson as "The Agent," and agreed that "will operate as a Commissioned Agent."  (Dkt. 123-1 at 5–9.)  While self-imposed labels are not always controlling, Parson admitted in his deposition that the agreement created a principal-agent relationship.  (Dkt. 123 at 38:4–6; Dkt. 124 at 18:13–16); *see Salters v. Pugmire Lincoln-Mercury*, 184 S.E.2d 56, 57 (Ga. Ct. App. 1971) ("[O]ne who is party to the relationship (principal or agent) may testify as fact to the existence or non-existence of the relationship.").  Parson said that he was an agent, that the CAA is a "pretty standard agency-type agreement," and that the agreement addressed his agency.  (Dkts. 123 at 39:23–40:21; 124 at 21:4–20).

Even so, Parson/Wind Logistics now claim Parson was not Universal's agent because the contract also identified him as an independent contractor and stated that the employees he hired were not

---

[6] Parson signed the CAA on January 11, 2012.  (Dkt. 123-1 at 5.)  He signed the Agency Agreement and the first promissory note on January 25, 2012.  (*Id.* at 10–12.)  Parson created Wind Logistics around January 2012.  (Dkt. 41-1 ¶ 7.)  Parson used Wind Logistics to complete his work as an exclusive agent for Universal.  Parson and Wind Logistics agree that the reference in the CAA to Agent is a reference to "Parson/Wind Logistics."  (Dkt. 121-2 at 5 (*referencing* Dkt. 37-5 ¶ 12).)

Universal's agents. (Dkt. 37-5 at ¶4 ("The Agent agrees that he (she) is an independent contractor and is not in the employ of The Company. . . . It is also understood that the Agent's employees are his (her) employees only and that this does not create a relationship of principal and agent.").)

Parson's/Wind Logistics's claim as to the legal significance of this contract language is incorrect for two reasons. First, the mere fact the contract identified Parson as an independent contractor is not dispositive. An individual can be both an independent contractor and an agent. *See Jennette v. Nat'l Cmty. Dev. Servs., Inc.*, 520 S.E.2d 231, 234 (Ga. Ct. App. 1999) ("[T]he terms 'independent contractor' and 'agent' are neither antonyms nor mutually exclusive."). Second, the language Parson/Wind Logistics cite refers to employees of Parson/Wind Logistics. (Dkt. 123-1 at 5.) The language does not disavow Parson's/Wind Logistics's status as agents.

Parson's/Wind Logistics's authority to bind Universal in contract also created an agency relationship. Parson/Wind Logistics could bid for GE Wind work, accept the loads that GE Wind awarded, and require Universal to provide those services to GE, all with no approval from Universal. (Dkt. 125 at 68:5–74:1, 88:1–89:19.) Parson/Wind Logistics

argue that, while the contract limited their ability to conduct business independently for Universal, their authority was not great enough to create an agency relationship. *See Physician Specialists*, 521 S.E.2d at 360 ("The distinguishing characteristic of an agent is that 'he is vested with authority, real or ostensible, to create obligations on behalf of his principal, bringing third parties into contractual relations with him.' ") (quoting *Se. Fid. Ins. Co. v. Heard*, 182 S.E.2d 153, 156 (Ga. Ct. App. 1971)). Parson/Wind Logistics had sufficient authority to create an agency relationship.

The undisputed evidence also establishes that Parson's/Wind Logistics's agency relationship continued until December 28 — meaning it was in effect at the relevant time. Parson wrote in his December 22 resignation letter that he "consider[s] the Agency Agreement terminated effective December 28, 2015." (Dkt. 123-1 at 14–15.) In the same letter, he stated that, even though he had decided to end his relationship with Universal, he had "continued to fulfill all contractual agreements" to it — thus showing his on-going representation of the company. (*Id.*) He also stated in two depositions that the agency relationship ended on December 28. (Dkt. 123 at 70:11–16 ("Q: Have you terminated this

commissioned agent agreement with Universal Truckload, or Universal Am-Can? A: Yes. Q: When did you do that? A: December 28th.”); (Dkt. 124 at 112:10–13 (“Q: You terminated your agency with Universal on December 28th, is that correct? A: Yes.”).)  During discovery, both parties believed their relationship continued until December 28, 2015.

Even so, Parson/Wind Logistics now argue that the agency relationship ended on December 16, the date on which Mark Limback appointed two new GE Wind agents.  Mr. Limback testified that other agents had become interested in taking over the work, but he “did not make any commitments at that time whatsoever.”  (Dkt. 120 at 118:21–19:2.)  Parson/Wind Logistics presented no evidence to rebut this testimony.  Even if they had, the mere appointment of another agent would not necessarily end Parson’s/Wind Logistics’s agency and their resulting obligations.  The undisputed evidence shows that Parson/Wind Logistics believed the contract continued through December 28.  They cannot now disavow those admissions to avoid summary judgment.

Because Parson/Wind Logistics had an agency relationship with Universal that continued until December 29, they also owed Universal a duty of loyalty until that day.  *See S. Parts & Eng’g Co.*, 2014 WL 667958,

at *3 (holding agents owe their principal the duty of loyalty); *Hanson Staple Co.*, 677 S.E.2d at 324 ("[A] cause of action against an employee for breach of loyalty must be based upon a fiduciary duty owed by the employee and must rise and fall with any claim for breach of fiduciary duty.") (quoting *Physician Specialists*, 521 S.E.2d at 360).

## 2. Breach of Fiduciary Duty and Duty of Loyalty

Universal alleges that Parson/Wind Logistics breached their fiduciary duty because they directly competed with Universal before December 28, 2015.

Under Georgia law, an agent cannot directly compete with its principal. *See Nilan's Alley, Inc. v. Ginsburg*, 430 S.E.2d 368, 369 (Ga. Ct. App. 1993). An agent can prepare to compete and begin competing right after its agency relationship ends but cannot do so before. *Id.* The Georgia Supreme Court has stated that "before the end of his employment, no employee may solicit customers for a rival business nor otherwise directly compete with his employer's business." *Tom's Amusement Co. v. Total Vending Servs.*, 533 S.E.2d 413, 417 (Ga. 2000). An agent soliciting customers or employees is a form of competition. *Robert, Ltd. V. Parker*, 450 S.E.2d 219, 220 (Ga. Ct. App. 1994). In

considering whether solicitation occurred, courts look to the kinds of communications the agent made and whether the agent made the communications before or after ending the agency relationship.

In *Robert, Ltd. v. Parker*, for example, the Georgia Court of Appeals found that sending a series of letters to former clients could constitute solicitation. 430 S.E.2d 219, 220 (Ga. Ct. App. 1994). While in *Hanson Staple Co. v. Eckelberry*, the court ruled that there had been no solicitation because the alleged tortfeasor did not tell his former employer's customers or ask for their business until after he resigned. 677 S.E.2d 321, 324 (Ga. Ct. App. 2009). And in *Nilan's Alley, Inc. v. Ginsburg*, the alleged tortfeasor spoke with his former employer's customers before he left. 430 S.E.2d at 369. The *Nilan's Alley, Inc.* court found there had been no solicitation because "these conversations were brief, non-specific, and strictly hypothetical." *Id.* The Court in *Akron Pest Control v. Radar Exterminating Co.*, 455 S.E.2d 601, 603 (Ga. Ct. App. 1995) used Black's Law Dictionary to define solicit, finding in part that "[t]he term implies personal petition and importunity addressed to a particular individual to do some particular thing." (citing *Solicit*, Black's Law Dictionary (6th ed. 1990).

Finally, in *Hlib, Rogal & Hamilton Co. of Atlanta v. Holley*, an insurance company sued its former vice president for breach fiduciary duty when the vice president began working for a competitor just one day after ending his employment. 670 S.E.2d 874, 878 (Ga. Ct. App. 2008). In affirming the denial of a directed verdict for the vice president, the Court of Appeals noted that — before resigning — the defendant obtained an agreement with one of his employer's client to make him their contact at the new company. *Id.* at 878. Second, the vice president established an email account and telephone number at his new company before terminating his relationship. *Id.* Third, he provided benchmarking information to his principal's competitor and offered the competitor information about a potential business prospect — all before resigning his employment. *Id.* The Georgia Court of Appeals found that by doing these things the vice president crossed the line from merely preparing to compete into actual competition.

Parson did many of the same things and more. He established himself as the client contact between Ace Doran and GE Wind before leaving Universal. (Dkt. 123 at 86:9–17.) He sent emails from an Ace Doran email account before he finished working for Universal; he began

working for Ace Doran three days after he left Universal; and he provided Universal's pricing and capacity information to Ace Doran. (*Id.*; Dkt. 125 at 81:4–82:2.) He also told GE Wind that 100% of his drivers would follow him to Ace Doran. (Dkt. 124 at 166:16–20.)

Parson/Wind Logistics argue that these actions were not improper solicitation because they confirmed no business between Ace Doran and GE Wind while still Universal's agent. Universal seeks to impose a higher standard than Georgia law requires. Solicitation does not require confirming business, only actions and conduct intended to incite the formation of a business relationship. *See Akron Pest*, 455 S.E.2d 601, 603 (Ga. 1995). Whether that conduct succeeded might go to damages but the conduct was still a breach.

For the reasons above, the Court finds that Parson/Wind Logistics meant "to incite the act of giving" GE Wind's contracts to Bennett. Parson/Wind Logistics thus breached his fiduciary duty as a matter of law by competing with Universal while he was still Universal's agent. Parson/Wind Logistics also breached their duty of loyalty to Universal. *See Crippen v. Outback Steakhouse Int'l, L.P.*, 741 S.E.2d 280, 284 (Ga. Ct. App. 2013) ("[A]n agent breaches a duty of loyalty owed to his

20

employer by using his position for his own personal benefit to the detriment of his employer").

### 3. Damages

To establish its claims, Universal must also show the breach proximately caused its damages. *See Perry Golf Course Dev., LLC*, 670 S.E.2d at 178. These damages can include disgorgement of commissions, compensatory damages, lost profits, or even nominal damages. *See McMillian v. McMillian*, 713 S.E.2d 920, 923 (Ga. Ct. App. 2011) (finding disgorgement an appropriate remedy); *Bienert v. Dickerson*, 624 S.E.2d 245, 249 (Ga. Ct. App. 2005) (awarding compensatory damages); *Monterrey Mexican Rest. of Wise, Inc. v. Leon*, 638 S.E.2d 879, 888 (Ga. Ct. App. 2006) (awarding lost profits).

Proof of damages is an element to a claim for breach of fiduciary duty, and a failure to prove damages is fatal to a movant's claim. *Niloy & Rohan, LLC v. Sechler*, 782 S.E.2d 293, 296–97 (Ga. Ct. App. 2016). At summary judgement, however, parties need not establish the exact amount of damages. *See e.g.*, *Impreglon, Inc. v. Newco Enterprises, Inc.*, 508 F. Supp. 2d. 1222, 1232 (N.D. Ga. 2007).

At the least, Universal did not receive Parson's and Wind Logistics's best efforts during his final months with the company, which makes it entitled to the disgorgement of his commissions. GA. CODE ANN. § 10-6-31 ("If [an agent] shall have violated his engagement, he shall be entitled to no commission."). Universal has thus shown Parson/Wind Logistics damaged it by breaching its fiduciary duty.

Universal has shown all three elements of a breach of fiduciary duty: (1) Parson was Universal's agent; (2) he breached his fiduciary duty; and (3) this breach proximately caused damage. Universal is thus entitled to summary judgment on its breach of fiduciary duty claim against Parson.

### i. Lost Profits

Parson/Wind Logistics argue lost profits are an inappropriate metric of damages. Under Georgia law, lost profits are available. Courts, however, are cautious in awarding them because lost profits are "too speculative and uncertain to be recoverable unless they are based on an *actual* track record of sales." *EZ Green Assocs., LLC v. Ga.-Pac. Corp.*, 770 S.E.2d 273, 277 (Ga. Ct. App. 2015) (finding projected sales too speculative to award lost profits). Courts proceed with caution because

of the many "hazards and chances" that can get in the way of a business making a profit. *Molly Pitcher Canning Co. v. Cent. of Ga. Ry. Co.,* 253 S.E.2d 392, 397 (Ga. Ct. App. 1979).

Universal has submitted ample evidence of lost sales and profits arising from Parson's and Wind Logistics' conduct. In 2012, 2013, 2014, and 2015, Wind Logistics generated $12 million, $22 million, $32 million, and $40 million respectively in revenue from contracts with GE Wind for Universal. (Dkt. 124 at 127:17–128:22.) After Parson left, Universal earned just $4.3 million from GE Wind. (Dkt. 120 at 45:16–19.) Parson/Wind Logistics argue that the drop in business between GE Wind and Universal happened for reasons other than the breach of fiduciary duty or alleged tortious interference. Parson's and Wind Logistics's contention raises an issue of material fact — the jury must decide what caused the business between GE Wind and Universal to decline from 2015 to 2016 — but Universal has met its burden of introducing "an actual track record of sales. *EZ Green Assocs.*, 770 S.E.2d at 273.

The Court denies Parsons/Wind Logistics's motion to exclude lost profits as a potential metric of damages on the breach of fiduciary duty or tortious interference claims.

### B. Breach of Contract on the Two Forgivable Loans

Both parties seek summary judgment on the enforceability of the two forgivable loans. Parson/Wind Logistics say they were unenforceable restrictive covenants. Universal says they are enforceable. Both forgivable loans were restrictive covenants and both contained unreasonable restrictions. Georgia law prohibits the Court from reforming the first to make it enforceable but not the second. As there are no other issues of material fact, the Court grants Parson's/Wind Logistics's motion for summary judgment on the first note but Universal's motion on the second note.

### 1. The First Loan Agreement

Parson/Wind Logistics filed the lawsuit in Georgia, and as a result, Georgia's choice of law rules govern. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The promissory note has a Michigan choice of law provisions, and Georgia law respects such a provision unless the result would violate Georgia public policy. *Convergys Corp. v. Keener*, 582 S.E.2d 84, 85 (Ga. 2003) ("The law of the jurisdiction chosen by the parties to a contract to govern their contractual rights will not be applied by Georgia courts where application of the chosen law would contravene

the policy of, or would be prejudicial to the interests of, this state.")
(quoting *Nasco, Inc. v. Gimbert*, 238 S.E.2d 368, 369 (Ga. 1977)); *see also*
*Paragon Techs., Inc. v. InfoSmart Techs.,* 718 S.E.2d 357, 358 (Ga. Ct.
App. 2011) ("[R]estrictive covenants in 'contracts for services by
independent contractors' should be treated like 'employee covenants
ancillary to employment contracts.' ").

Georgia has a public policy against enforcing contracts "in general
restraint of trade. GA. CODE ANN. § 13-8-2(a)(2). That Parson/Wind
Logistics and Universal labeled the agreement at issue in this case a
"loan" is irrelevant. To determine whether a contract restrains trade, the
Court looks to the legal effect of a contractual provision" not labels or the
manner of enforcement. *Dougherty, McKinnon & Luby, P.C. v.*
*Greenwald, Denzik, & Davis, P.C.*, 447 S.E.2d 94, 96 (Ga. Ct. App. 1994)
(quoting *Club Prop. v. Atlanta Offices-Perimeter*, 348 S.E.2d 919, 920 (Ga.
Ct. App. 1986)). The legal effect of the first loan agreement restrains
trade by calling for a $10,0000 penalty triggered simply by the fact of
competition. (Dkt. 123-1 at 12.) It states that, if Parson breaches the
agreement and "leave[s] to form his own company or affiliate with a
competitor" before repaying the note, he will immediately have an

obligation to repay the outstanding balance "prior to representing any other freight companies" and will also pay "a $10,000.00 penalty."[7] (*Id.*) The purpose of this provision was to make it difficult for Parsons/Wind Logistics to compete with Universal or at least to give them pause before deciding to do so. They would have had to weigh the cost of paying the $10,000 "penalty" and of immediately repaying a note that they would not otherwise have had to pay for five years against their desire to compete with Universal either directly or by affiliating with another company. And the "penalty" was not small — being more than ten percent of the loan itself. Without this provision, Parson/Wind Logistics would have been free to compete without having to buy that right through the acceleration of the note and the penalty.

Georgia Courts have held such provisions restrain trade. *Dougherty,* 447 S.E.2d 96 (agreement requiring employees to pay liquidated damages upon working for competitor considered restraint of trade); *Club Prop.*, 348 S.E.2d at 920 (agreement that lessee would pay

---

[7] The agreement states that the amounts due (that is the unpaid balance and the penalty) "will be made upon demand." (Dkt. 123-1 at 12.) That Universal has some ability to delay the actual payment is irrelevant. The agreement imposes financial obligations on Parson/Wind Logistics merely for deciding to compete with Universal.

lessor to pay $5,0000 if it employed lessor's employee with certain time considered restraint of trade); *compare Brecher v. CitiGroup Global Markets, Inc.*, No. 09CV1344, 2010 WL 1291940, at *2 (S.D. Cal. Mar. 29, 2010) (agreement requiring employees to repay forgivable loans upon termination of employment regardless of later competition not unfair). That Parson/Wind Logistics was an independent contractor rather than an employee does not distinguish this case. "[R]estrictive covenants in contracts for services by independent contractors [are] ... treated like employee covenants ancillary to employment contracts." *Paragon Tech., Inc. v. Infosmart Tech., Inc.*, 718 S.E.2d 357, 358 (Ga. Ct. App. 2011). (citation and quotation marks removed).

Georgia law does not, however, automatically bar restrictive covenants in employment agreement. That is because such restrictive covenants "are considered to be only in partial restraint of trade." *Dougherty,* 447 S.E.2d 94, 96. Courts will uphold restrictive covenants in employment contracts if their restrictions are "reasonable, founded on valuable consideration, reasonably necessary to protect the interest of the party in whose favor they are imposed, and not unduly prejudicial to the public interest." *Id.* Whether a restraint imposed by an employment

contract is reasonable is a question of law for determination by the Court. *W.R. Grace & Co. v. Mouyal*, 442 S.E.2d 529, 532 (Ga. 1992). In evaluating such restrictions, Georgia Courts look at whether the restriction "is strictly limited in time and territorial effect and [is] otherwise reasonable considering the business interests of the employer sought to be protected and the effect on the employee." *Dougherty*, 447 S.E.2d at 96 (quoting *Singer v. Habif, Arogeti & Wynne, P.C.*, 297 S.E.2d 473, 475 (Ga. 1982).

The Georgia Code also lays out a series of rebuttable presumptions that provide more guidance about the time and territorial restriction. Georgia law considers any restraint that stretches more than two years unreasonable. GA. CODE ANN. § 13-8-57(b). It also says that territorial restrictions that encompass the area in which the employer conducted business is reasonable provided the "total distance is reasonable" and the agreement "contains a list of particular competitors as prohibited employers for a limited period of time after the term of employment or a business or commercial relationship." § 13-8-56(2).

Applying these presumptions, the first promissory note has no geographic restrictions, no list of prohibited companies, and a five-year

prohibition. It prevents Parson/Wind Logistics from competition everywhere for that five-year period. It not only prevents Parson/Wind Logistics from soliciting former Universal clients, it also prevents them from accepting work from Universal clients who might first contact Parson/Wind Logistics. In doing so, it provides Universal more protection than Universal can expect under the law and also adversely impacts innocent third parties, depriving them of the option of leaving Universal for Parson/Wind Logistics. The agreement also does not merely protect Universal for its existing clients, it prevents Parson/Wind Logistics from competing with Universal for new customers. The agreement thus adversely impacts other companies with no prior relationship with Universal by preventing Parson/Wind Logistics from offering services to them in competition with Universal. The agreement fails in nearly every respect under an analysis of Georgia law and Universal provides no legal support to overcome Georgia's presumption of unreasonableness.

Of course, Georgia law permits a court to modify contracts with unreasonable restrictive covenants. § 13-8-54(b) ("[T]he court may modify the restraint provision and grant only the relief reasonably necessary to protect such interest or interests and to achieve the original

intent of the contracting parties to the extent possible."). Courts, however, cannot "reform and rewrite" contracts to make them acceptable to Georgia public policy. *LifeBrite Labs., LLC v. Cooksey*, No. 1:15-CV-4309, 2016 WL 7840217, at *7 (N.D. Ga. Dec. 9, 2016). ("Though courts may strike unreasonable restrictions, and may narrow over-broad territorial designations, courts may not completely reform and rewrite contracts by supplying new and material terms whole cloth.").

The repayment provision on the first forgivable loan has no geographical limitation and does not list competitors for whom Parson/Wind Logistics can and cannot work. To add these restrictions would be adding a material term, which the Court cannot do. As a result, the term requiring repayment upon leaving to compete is an unreasonable restraint on trade, and thus unenforceable. The Court grants summary judgment to Counterclaim Defendants on the first promissory note.

### 2.    The Second Loan Agreement

The second promissory note has two separate provisions. The first states that — if Parson/Wind Logistics are no longer agents of Universal during the five-year period of the note — they will repay Universal one

sixtieth of the note for each month left in the five-year term. (Dkt. 123-1 at 13.) In essence, they agree to repay the outstanding balance if the agency agreement ends for any reason during the term of the note. The second provision requires Parson/Wind Logistics to pay the outstanding balance "prorated, on a daily basis, based on the remainder of the contracted time" if Parson/Wind Logistics "leaving to form their own company or affiliate with a competitor" during the term of the note. *Id.*

The first repayment obligation does not depend on Parson/Wind Logistics deciding to compete with Universal. Parson/Wind Logistics had to repay the note on a prorated monthly basis if they end the agency relationship for any reason. This provision does not restrain trade. It merely sets forth a repayment obligations regardless of competition.

The second provision, however, explicitly provides a separate repayment obligation if Parson/Wind Logistics leave to compete. For the reasons set forth above for the first Loan Agreement, this provision constitutes a restrain of trade. And, like the first loan agreement, this provision extends for five years, contains no territorial restriction, and includes no list of customers. For the reasons set forth above for the first

loan agreement, this provision constitutes an unreasonable restrain of trade.

The Court may reform this contract, however, to remove the offending provision. The Georgia Code permits courts to "modify a covenant that is otherwise void and unenforceable so long as the modification does not render the covenant more restrictive with regard to the employee than as originally drafted by the parties." GA. CODE ANN. § 13-8-53(d). Courts can therefore sever or remove "part of a restrictive covenant that would otherwise make the entire restrictive covenant unenforceable." § 13-8-51(11); *see LifeBrite Labs., LLC*, 2016 WL 7840217, at *6 ([T]his language makes it clear that courts can remove offending language . . . ."). The Court removes the second provision, described above, leaving only the first repayment provision. (Dkt. 123-1 at 13.)

Since this analysis leaves the second loan agreement with only a repayment provision that does not violate Georgia public policy, the Court will apply the contract's choice of law, Michigan. Under Michigan law, there are three elements of a breach of contract: (1) existence of a contract; (2) breach of contract; and (3) damages resulting from that

breach. *Bank of Am., NA v. First Am. Title Ins. Co*, 878 N.W.2d 816, 830 (Mich. 2016). By failing to repay the amount due on the second promissory note, Parson/Wind Logistics committed all three elements of a breach of contract. First, as there was offer and acceptance, the second forgivable loan was a contract. *See Pakideh v. Franklin Commercial Mortf. Grp., Inc.*, 540 N.W.2d 777, 780 (Mich. Ct. App. 1995) (holding valid contracts require offer and acceptance); *see also Mich. Nat'l Bank v. Laskoski*, 580 N.W.2d 8, 10 (Mich. Ct. App. 1998) (holding the construction of an unambiguous contract to be a question of law for the court).

Second, Parson/Wind Logistics are no longer agents of Universal, requiring them to repay the loan on a per month basis. That they failed to pay is undisputed. *H.J. Tucker & Assocs., Inc. v. Allied Chucker & Eng'g Co.*, 595 N.W.2d 176 (Mich. Ct. App. 1999) ("A claim for breach of contract accrues when the promisor fails to perform under the contract."). Third, Parson's and Wind Logistics's breach damaged Universal, depriving it of $308,333.41. (Dkts. 123 at 51:8–16; 124 at 33:5–16); *Kewin v. Mass. Mut. Life. Ins.*, 295 N.W.2d 50, 52–53 (Mich. 1980) ("[T]he damages recoverable for breach of contract are those that arise naturally

from the breach or those that were in contemplation of the parties at the time the contract was made.").

Parson/Wind Logistics argue Universal has no right to summary judgment on this issue because Universal breached the Commissioned Agency Agreement when it contacted drivers that worked with Parson/Wind Logistics. Since Universal breached the agreement, they say it cannot maintain an action to recover the promissory note. *Able Demolition v. Pontiac*, 739 N.W.2d 696, 701 (Mich. Ct. App. 2007). ("The rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform.") (quoting *Michaels v. Amway Corp.*, 522 N.W.2d 703, 707 (Mich. Ct. App. 1994)).

To make this finding, however, the Court would need to conclude that the second forgivable loan modified the Commissioned Agency Agreement, becoming a part of the agreement between Universal and Parson that established their independent contractor relationship. *Carlos Dos, Inc. v. Garnett's Lounge, Inc.*, No. 177760, 1996 WL 33357920, at *2 (Mich. Ct. App. Sept. 20, 1996) (finding separate contracts should be read together when they are interdependent).

Under Michigan law, a party alleging a modification of a contract must establish the parties' mutual intention to modify the original contract. *Quality Prods. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258 (Mich. 2003). The second forgivable loan does not establish the mutual intention to modify the original agreement. Parson/Wind Logistics cites *Phillips v. Grace Hospital*, in which a hospital patient signed two arbitration clauses four days apart. 580 N.W.2d 1, 4 n.6 (Mich. Ct. App. 1998). That court found that "[i]f the terms on the two forms were different, but the parties and subject matter were the same, there would be two agreements, but the second agreement would likely be considered a modification, or an implicit revocation, of the first." *Id.* at 4 n.6. The case here is distinguishable. The second forgivable loan was for $500,000 and the parties executed it two years after the initial contract. If the parties meant for it to modify the original contract, they would have made that clear, inserting a provision into the document or taking some other action that evidence their intention.

The second forgivable loan did not modify the Agency Agreement or the Commissioned Agency Agreement. The loan was a separate contract and is thus independently enforceable. The second forgivable loan makes

clear that Parson/Wind Logistics must repay the loan if the agency relationship ends for any reason — that is, no matter who ends the relationship. The Court grants Defendant Universal summary judgment as to the second loan agreement.

### 3. Tortious Interference

Universal filed claims against Parson/Wind Logistics and Bennett for tortious interference with business relations. Parson/Wind Logistics and Bennett move for summary judgment. To establish a claim for tortious interference with business relations, a plaintiff must show that a defendant (1) acted improperly and without privilege; (2) purposefully and with malice and with intent to injure; (3) induced a third party not to enter into or continue a business relationship with the plaintiff; and that the (4) tortious conduct proximately harmed plaintiff. *Tom's Amusement Co.*, 533 S.E.2d at 416. The Court takes the two tortious interference claims in turn.

### A. Tortious Interference Claim Against Parson

Universal alleges that Parson tortuously interfered with Universal's relationships with GE Wind and with the truck owners/operators. A plaintiff can only bring a claim of tortious

interference against strangers to the business relationship.  *See Atlanta Mkt. Ctr. Mgmt. v. McLane*, 503 S.E.2d 278, 282 (Ga. 1998).

There appears to be a split in authority about whether employees acting outside the scope of the agency can commit tortious interference. A federal court in *AmeriGas v. Propane* found that an employee acting outside the scope of their agency could commit tortious interference.  972 F. Supp. 685, 695 (S.D. Ga. 1997).  But two years later, the Georgia Court of Appeals ruled in *Tom's Amusement* that "[r]egardless of whether an employee is acting as an agent of his employer when engaging in the interference, he is not a stranger to the business relationship between his employer and the customer he personally services, and thus cannot be held liable under a claim of tortious interference."  533 S.E.2d at 417. The state court had a chance to adopt *AmeriGas*'s holding but declined to do so.[8]  This Court, under *Tom's Amusement*, finds that an employee

---

[8] Additionally, *AmeriGas*'s use of authority is unclear.  *AmeriGas* cites *A.L. Williams & Assocs. V. Faircloth*, 380 S.E.2d 471 (Ga. Ct. App. 1989) for the proposition that a company's agent can be liable for tortious interference if the agent acted outside the scope of his agency. *AmeriGas*, 972 F. Supp. at 695.  The *A.L. Williams* case, however, does not stand for that proposition.  That court's discussion of the tortious interference claim is sparse, in large part focusing on the violation of the agency relationship.

cannot be a stranger to a business relationship, even if that employee is acting outside the scope of the business relationship.

Applying this rule, Parson was Universal's agent and not a stranger to the business relationship between Universal and GE Wind, or Universal and the fleet owners and operators. Parson thus cannot be liable for tortious interference. The Court grants summary judgment to Parson/Wind Logistics motion for summary judgment on the tortious interference claim.

### B. Tortious Interference Claim Against Bennett

Bennett also seeks summary judgment, claiming its conduct was not wrongful as a matter of law. Claims of tortious interference require "improper action or wrongful conduct by the defendant without privilege." *Tom's Amusement Co.*, 533 S.E.2d at 416. "Improper conduct means wrongful action that generally involves predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions." *LifeBrite Labs., LLC*, 2016 WL 7840217. "Merely to persuade a person to break his contract, may not be wrongful in law or fact. But if the persuasion be used for the indirect purpose of injuring

the plaintiff, or of benefitting the defendant, at the expense of the plaintiff, it is a malicious act, and a wrongful act, and an actionable act if injury ensues from it." *Id.* at 9 n.87 (quoting *Architectural Mfg. Co. of Am. V. Airotec, Inc.*, 166 S.E.2d 744, 746 (Ga. Ct. App. 1969)).

Universal alleges that Bennett "used Universal's exclusive agent to gain access to information about Universal and GE Wind that was not available to them in the open market and to exert influence over GE Wind that would not otherwise have been available to them until after Parson terminated his agency with Universal and joined Bennett." (Dkt. 129 at 21.) Along with other conduct, Plaintiff alleges that Bennett (1) asked Parson to provide a list of drivers leased to Universal; (2) asked Parson to recruit fleet owners and operators to join Bennett; (3) asked Parson to provide information about Ace Doran's capacity and pricing; and (4) sought Parson's opinion on whether trailers would be enough to haul GE Wind outbound freight. (Dkts. 124 at 142:20–144:4; 125 at 106:7–22; 133 at 20:1–21:3.) Universal says all of this was improper, predatory, and a violation of Georgia law.

Bennett cites two Georgia cases in support of its claim that its conduct did not rises to the level of tortious interference as a matter of

law. Both are distinguishable. In *Gordon Document Products, Inc. v. Service Technologies*, 708 S.E.2d 48, 54 (Ga. Ct. App. 2011), for example, an employer claimed that its former employee "procured the defection" of three of his co-workers to a new employer. The court found no tortious interference had occurred because the defendant did nothing to make the co-workers leave. *Id.* at 54–55. Rather, he exploited "prevalent employee dissatisfaction" and "merely provided the opportunity that others had already been seeking." *Id.* In contrast, the case here has a disputed question of fact about why the truck drivers left Universal for Bennett. The drivers may have left because of the work environment or they may have left because of Bennett's actions. The record is unclear, precluding summary judgment.[9]

---

[9] The court in *Gordon* also found the behavior would not violate "the protection of the privilege of fair competition" which guards against the imposition of undue restraints on the pursuit of employment opportunities in the marketplace *Gordon*, 708 S.E.2 at 55. But, the Georgia Court of Appeals has held that the privilege of fair competition does not did not permit corporate officers to violate their fiduciary duties by recruiting company employees to work for a new business. *Gresham & Assocs., Inc. v. Strianese*, 595 S.E.2d 82, 85 (Ga. Ct. App. 2004) ("[A] corporate employee owing fiduciary duties to the corporation is not a privileged competitor of the corporation."). Parson/Wind Logistics owed Universal the same fiduciary duty. Bennett, therefore, cannot claim that Parson's/Wind Logistics's conduct was that of a privileged competitor.

Bennett also cites *LifeBrite Laboratories, LLC*, 2016 WL 7840217. In that case, a sales representative told three clients that she would no longer work with her company. *Id.* at 2. The three clients then stopped working with the company. *Id.* The court found that even if the meeting between the sales representative and the three clients had been a sales pitch, it would not have been tortious interference because "[h]aving a conversation with someone for the purpose of trying to win his business is not in the same category" as predatory tactics. *Id.* at 9. But here, Bennett allegedly used information unavailable on the open market. This allegation differs from a sales pitch, and a question of material fact exists about whether this persuasion was wrongful, improperly "benefitting the defendant, at the expense of the plaintiff." *Architectural Mfg. Co. of Am.*, 166 S.E.2d at 746.

The Court finds that genuine questions of material fact remain as to whether Bennett tortuously interfered with Universal's business relationships and denies Bennett's motion for summary judgment.

### 4.   Civil Conspiracy

Counterclaim Defendants who filed this motion also move for summary judgment on Universal's civil conspiracy claim. "To make out

a claim for a civil conspiracy, [the movant] must show that two or more persons, acting in concert, engaged in conduct that constitutes a tort. Absent the underlying tort, there can be no liability for civil conspiracy." *Lady Deborah's, Inc. v. VT Griffin Servs.*, No. CIV. A. CV207-079, 2007 WL 4468672, at *4 (S.D. Ga. Oct. 26, 2007).

The Court found above that Parson breached his fiduciary duty to Universal. Breach of fiduciary duty is a business tort, and the civil conspiracy claim can follow the breach of fiduciary duty claim. There also remains a civil conspiracy claim about the tortious interference claim. A jury must decide whether there was tortious interference and the jury must decide whether there was a conspiracy about it. The Court thus denies summary judgment on the civil conspiracy claim.

## IV. Conclusion

The Court **GRANTS** Universal's Motion for Summary Judgment (Dkt. 115) on the breach of fiduciary duty claim and on the breach of contract claim on the second forgivable loan. The Court **DENIES** Universal's Motion for Summary Judgment as to the breach of contract claim on the first forgivable loan. The Court **GRANTS** Parson's and Wind Logistics's Motion for Summary Judgment (Dkt. 121) on the

tortious interference claim against Parson and the breach of contract claim on the first forgivable loan. The Court **DENIES** Parson's and Wind Logistics's Motion on lost profits, the civil conspiracy claim, the breach of contract on the second forgivable loan, and the tortious interference claim against Bennett.

**SO ORDERED** this 23rd day of September, 2019.

Michael L. Brown
United States District Judge