# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

Wind Logistics Professional, LLC,
and Anthony Parson,

      Plaintiffs/Counterclaim
      Defendants,

                            Case No. 1:16-cv-00068

v.

Universal Truckload, Inc.,         Michael L. Brown
                            United States District Judge

      Defendant/Counterclaim
      Plaintiff,

Ace Doran, LLC, Bennett Motor
Express, LLC, and Bennett
International Group, Inc.,

      Counterclaim Defendants.

_____/

## OPINION & ORDER

      Counterclaim Defendants move to exclude some testimony by Counterclaim Plaintiff's damages expert. (Dkt. 150.) The Court denies that motion.

## I.   Background

Counterclaim Plaintiff Universal Truckload, Inc. ("Universal") sues Counterclaim Defendants Wind Logistics Professional LLC, and Anthony Parson for breach of fiduciary duty.   Universal sues Counterclaim Defendants Ace Doran, LLC; Bennett Motor Express, LLC; and Bennett International Group, LLC (collectively "Bennett") for tortious interference with a business relationship.[1]

Anthony Parson worked as an independent contractor for Universal, coordinating the transportation and delivery of industrial wind equipment for one client, GE Wind Energy Outbound ("GE Wind"). (Dkt. 131-1 ¶¶ 1–4.)  He created a network of truck drivers who worked as independent contractors to carry GE Wind freight under Universal's motor carrier license.  (Dkt. 119 at 13:7–10.)  The drivers owned and operated specialized transportation equipment for over-sized loads.  (Dkt. 124 at 45:22–46:9.)  Over the years, Universal used this arrangement to increase its business with GE Wind, growing from $22 million in 2013 to $40 million in 2015.  (Dkt. 124 at 127:23–128:22.)

---

[1] Universal also brought a tortious interference claim against Mr. Parson and Wind Logistics.  (*See* Dkt. 38 at 27.)  The Court dismissed that claim. (*See* Dkt. 146 at 36–38.)

In 2015, Mr. Parson decided to leave Universal and join a competitor, Bennett.  (*Id.* at 40:2–17.)  In November 2015, he signed a letter saying he would join Bennett in January 2016.  (Dkt. 124-1 at 33–34.)  He did not, however, tell Universal of his plan, and Universal only learned of it in mid-December.  (Dkt. 120 at 111:1–12.)  While Universal was in the dark, Mr. Parson had extensive communications about his plan with Bennett, GE Wind, and the network of drivers.  (*See* Dkt. 146 at 6–8.)  After his departure, Universal's business with GE Wind shrunk to $4.3 million.  (Dkt. 120 at 41:6–19.)  The Court previously found Mr. Parson breached his fiduciary duty to Universal.  (*See* Dkt. 146 at 11–22.)  Universal also still has tortious interference claims against Bennett.

Universal retained Mr. Kahaian to calculate the economic loss, including lost profits, it suffered as a result of Parson's and Bennett's alleged misconduct.  Mr. Kahaian found all of Universal's lost profits resulted from the Counterclaim Defendants' tortious conduct.  (Dkt. 150-1 at 6.)  Mr. Kahaian calculated lost profits using the so-called "before-and-after" methodology.  (*Id.* at 6.)  He did this by comparing Universal's profits before (or but-for) Parson's and Universal's actions with its profits after (or as a result of) the alleged actions.  (*Id.*)  This method was

intended to identify the profits Universal would have earned if the Parson Counterclaim Defendants had not severed their relationship with Universal.  In his report, Mr. Kahaian explained this "is a commonly accepted method whereby it is assumed that the business would have performed consistently with its actual historical results." (*Id.*)  He further explained that, as part of his analysis, he estimated the value of GE Wind's business that Universal would have received, deducted identifiable costs Universal would have incurred to generate that business, considered steps Universal took to mitigate the impact of Parson's and Bennett's actions, and applied a discount rate to arrive at the present value of lost profits.  (*Id.*)  For the "before" period, he used a growth rate of 9.3%, which he found from a report paid for by the American Wind Energy Association ("AWEA Report").  (*Id.*)  For the "after" period, he used a growth rate of 20%, which he described as in line with Universal's 2016–2017 financial information.  (*Id.* at 28.)

The Counterclaim Defendants seek to exclude Mr. Kahaian's testimony and report on lost profits for two reasons: first, they argue Mr. Kahaian inappropriately assumed all of Universal's lost profits occurred as a result of Mr. Parson's breach of fiduciary duty and Bennett's tortious

interference.[2]   Second, Counterclaim Defendants argue Mr. Kahaian's calculation of lost profits is unreliable, specifically his metrics for projected growth for both the before and after periods.

## II.   Standard of Review

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert opinions.  It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The party seeking to introduce expert testimony must establish, by a preponderance of the evidence, the factors set out in Rule 702.  *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir.2004).  The Supreme Court discussed the standard of admissibility of expert testimony in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Under *Daubert*,

---

[2] Counterclaim Defendants do not seek to exclude his report on contractual damages or disgorgement damages.  (*See* Dkt. 150-1 at 5.)

> expert testimony may be admitted into evidence if: (1) the
> expert is qualified to testify competently regarding the
> matters he intends to address; (2) the methodology by which
> the expert reaches his conclusions is sufficiently reliable as
> determined by the sort of inquiry mandated in *Daubert*; and
> (3) the testimony assists the trier of fact, through the
> application of scientific, technical, or specialized expertise, to
> understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562–63 (11th

Cir.1998) (footnote omitted) (citing Fed. R. Evid. 702; *Daubert*, 509 U.S.

at 589).

The Supreme Court emphasized that the Rule 702 inquiry is a

flexible one. *Id.* at 594. And, while *Daubert* focused on the admissibility

of scientific expert testimony, in *Kumho Tire Co. v. Carmichael*, 526 U.S.

137 (1999), the Supreme Court held that *Daubert*'s methodology applies

equally to experts who are not scientists. The Court held that a trial court

may consider one or more of the specific factors mentioned in *Daubert* in

assessing non-scientific expert testimony, but the trial court retains

discretion to decide if non-scientific testimony is reliable and relevant to

the case. *Kumho Tire*, 526 U.S. at 141.

When conducting this inquiry for experts offering non-scientific

testimony, the advisory committee notes for Rule 702 suggest that courts

consider factors such as:

6

(1)    Whether the [expert is] proposing to testify about matters growing naturally and directly out of research conducted independent of the litigation, or whether [the expert] has developed the opinion expressly for purposes of testifying;

(2)    Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(3)    Whether the expert has adequately accounted for obvious alternative explanations;

(4)    Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and

(5)    Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702, advisory committee note (2000 amends.) (citations and internal quotations omitted); *see also Kumho Tire*, 526 U.S. at 149–52.

Finally, expert testimony must actually assist the trier of fact to understand the facts in evidence or to determine a fact in issue.  Fed. R. Evid. 702(a).  Expert testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person." *Frazier*, 387 F.3d at 1262.  Expert testimony generally will not help the trier of fact "when it offers nothing more than what lawyers for the parties can argue in closing arguments." *Id*. at 1262–63.

Principally, Rule 702 imposes a duty on trial courts to act as "gatekeepers" to ensure that speculative, unreliable, and irrelevant opinions do not reach the jury. *See Daubert*, 509 U.S. at 589 n.7; *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002); *McClain v. Metabolife Intern., Inc.*, 401 F.3d 1233, 1237 (11th Cir. 2005). At the same time, a court must heed its role as a gatekeeper and the jury's role as the ultimate fact-finder. The gatekeeping function "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## III.   Discussion

### A.   Whether Mr. Kahaian's Opinion Lacks Foundation

Counterclaim Defendants claim Mr. Kahaian improperly assumed that all of Universal's lost profits occurred because of Mr. Parson's breach of fiduciary duty and Bennett's tortious interference rather than looking at alternative causes for the downturn in profits. (Dkt. 150 at 12.) As a

8

result, they say his opinion lacks a proper foundation.  Nowhere in his report did Mr. Kahaian say he considered whether either Universal's own conduct or the Counterclaim Defendant's non-tortious conduct might have led to Universal's reduced profits.  In its briefing, Universal insisted its expert was permitted to merely assume causation.  (Dkt. 155 at 6–7.) It also argued it was logical to do so here because "there are no reasonable alternative sources of Universal's lost profits" other than Counterclaim Defendants' misconduct."  (*Id.* at 9.)

Counterclaim Defendants cite *Flowers Bakeries Brands, Inc. v. Interstate Bakeries Corp.*, No. 1:08-cv-2376, 2011 WL 1004657 (N.D. Ga. Mar. 17, 2011) and *Zimmer, Inc. v. Stryker Corp.*, No. 3:14-cv-0152, 2018 WL 276324 (N.D. Ind. Jan. 3, 2018), in support of their argument that the expert testimony is inadmissible.  In *Flowers*, a trademark infringement case, the defendant sought to exclude an expert's testimony about lost profits because the expert failed "to account for lost profits attributable to market factors such as price, advertising, and quality" other than the defendant's conduct.  *Flowers Bakeries Brands, Inc.*, 2011 WL 1004657 at *2.  Indeed, the expert conceded that he did not consider those factors.  *Id.*  The court excluded the expert's testimony, finding his

9

intentional decision to ignore other admittedly present market factors rendered his testimony unreliable and unhelpful to the jury. *Id.* at *3. The court explained that "while any calculation might have proven imprecise, [the expert] ensured his calculations would be particularly inaccurate by ignoring factors that could be significant to his analysis." *Id.*

Similarly, in *Zimmer*, a plaintiff proffered expert testimony to show its profits fell as a result of key employees' breaches of non-compete agreements. 2018 WL 276324, at *3. The expert, like Mr. Kahaian, used the before-and-after methodology. *Id.* at *2. The expert admitted at his deposition that he assumed all lost profits arose from the alleged misconduct. *Id.* The court explained that "[a]t every critical point in his opinion, [the expert] attributes lost revenue and profits to [defendants'] alleged wrongdoing without ever considering the possibility that the lost revenues and profits flowed from other non-actionable events." *Id.* at *4. The district court thus excluded the expert's testimony as utterly unhelpful to the jury in deciding what lost profits resulted from the defendants' conduct. *Id.*

Universal seeks to counter these cases by pointing to *B-K Cypress Log Homes Inc. v. Auto-Owners Insurance Co.*, No. 1:09-cv-211, 2012 WL 1933766, (N.D. Fla. May 25, 2012).  In that case, the court permitted an expert's testimony that assumed "all loss in profitability was attributable to [defendant's] bad faith."  *Id.* at *5.  The court found it remained the jury's role to "consider and weigh such evidence and determine whether in fact some or all of the damages determined by [the expert] are causally connected to [the defendant's] actions."  *Id.*

This Court agrees with *Zimmer* and *Flowers*.  Perhaps an expert can assume liability for all lost profits in some case.  But not here. Universal continued to operate after the alleged misconduct.  Its business is complicated, relying upon GE Wind to provide loads, drivers to accept their assignments, and Universal to earn continuing business by satisfying GE Wind's needs.  Universal cannot prevent the drivers from working for other companies.  Nor could it require Parson to continue working with it.  To recover against Parson and the Bennett entities, Universal must show that damages (including lost profits) arose from Parson's breach of its fiduciary duty and/or the Bennett entities' tortious interference rather than from some other market force.  Expert testimony

11

that merely assumes this causation without doing any such analysis would not assist the trier of fact in calculating recoverable damages (if any).

It may be difficult to assess damages and any calculation may prove somewhat imprecise. A jury can assess that. The Court also does not hold an expert must consider and eliminate all possible causes. *See Packgen v. Berry Plastics Corp.*, 847 F.3d 80, 87 (1st Cir. 2017) (finding an expert "not required to eliminate every other possible cause" of lost profits in a products liability case (citing *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996) ("The fact that several possible causes might remain 'uneliminated' . . . only goes to the accuracy of the conclusion, not the soundness of the methodology."))). But, to allow an expert to present testimony that ignores the difference between actionable conduct and nonactionable conduct would be to ignore the requirement that expert testimony must assist the trier of fact in deciding some relevant issue.

This conclusion may not decide the ultimate issue here because, despite having argued in its response brief that Mr. Kahaian was not required to consider causation but rather could merely assume it,

12

Universal took a different position at a hearing before this Court. Specifically, Universal insisted that Mr. Kahaian actually considered other potential factors in determining all of Universal's profits resulted from the alleged misconduct.  It argued that Mr. Kahaian's expert opinion is thus admissible under the holdings in *Flowers* and *Zimmer*.

At the hearing on Counterclaim Defendants' motion to exclude Mr. Kahaian's testimony, Universal relied heavily on Mr. Kahaian's deposition testimony.  It showed, for example, that when asked about factors he considered outside the tortious acts, he said he looked at "the whole body of work."  (Dkt. 153 at 110:25–11:17.)  This included "economic factors," "things happening in the industry," or a "labor workforce issue."  (*Id.*)  He testified that, after considering these factors, "in this case, it was pretty clear that the loss of revenue and profitability was directly related to Mr. Parson and the Counter-Defendants as a whole taking that business."  (*Id.*)

In their motion to exclude, Counterclaim Defendants argued that Mr. Kahaian never considered whether Universal might have lost drivers (and thus GE Wind business) because it considered implementing a policy of delaying drivers' payments.  (Dkt. 150 at 13.)  At the hearing,

however, Universal showed Mr. Kahaian considered this.  It pointed to testimony by Mr. Kahaian that he considered how Universal contributed towards the loss of the drivers — he knew that Universal proposed changing the timing of driver pay, but he did not think that proposal impacted Universal's business because Universal never implemented it. (Dkt. 153 at 112.)  Testifying about Universal's proposed change to the timing of driver pay, he said, "I wouldn't have considered that as a reason why the business would have moved.  The business moved because Mr. Parson left." (*Id.* at 112:14–13:5.)  Though he analyzed other factors, his main consideration was the economic data: "what happened in terms of the financial activity, that provided clarity as to how I could directly link the loss of business to those actions." (*Id.*)

In their motion to exclude, Counterclaim Defendants also argued Mr. Kahaian failed to consider testimony by Thomas Robinson, the GE Wind employee with responsibility for wind shipments of GE freight. (Dkt. 150 at 12.)  Counterclaim Defendants explained that Mr. Robinson testified, for example, that he did not initially award loads to Bennett until Universal rejected them, that Universal hurt its relationship with GE Wind by brokering freight to unauthorized carriers and by failing to

properly train its employees on the GE Wind account, and that Universal actually returned some awards to GE Wind because it lacked the capacity to complete them.  (*Id.*)  He also testified that Parson never solicited him to take loads from Universal to the Bennett entities.  (*Id.*)  Counterclaim Defendants argued that Mr. Kahaian failed to consider all of this.  But it appears Mr. Kahaian read Mr. Robinson's deposition testimony.  His expert report lists Mr. Robinson's deposition as a source he considered. (Dkt. 151-1 at 10.)  He also testified that he read it.  (Dkt. 153 at 115.)

Mr. Kahaian may have weighed the evidence differently than Counterclaim Defendants or their expert weighed it.  He also may not have considered every potential cause that Counterclaim Defendants' lawyers or their expert can posit at the end of discovery based upon their review of the facts and advocacy.  But to offer an opinion, he did not have to consider every potential other source of lost profits.  *See Ambrosini*, 101 F.3d at 140.  That a lawyer or another expert can think of some other cause or some other factor that another expert did not consider is not the test for the admissibility.  To make that the test would cause Rule 702 to turn on novel arguments of counsel and "but what about this" arguments. He apparently considered other causes, including causes Counterclaim

Defendants' cited in their motion, and that is sufficient (in this case) to distinguish *Flowers* and *Zimmer*.

The Court acknowledges that some evidence could undercut Mr. Kahaian's conclusions.  He did not, for example, include any analysis of these issues in his report.  And, other than testifying that he reviewed Mr. Robinson's deposition, he did not testify as to how he discounted the issues Counterclaim Defendants raise from it.  Perhaps that means he did not really consider those issue in any meaningful way.  But, during Mr. Kahaian's deposition, Counterclaim Defendants chose not to probe the extent of his consideration in any great detail.  For present purposes, the Court concludes Universal has carried its burden of showing by a preponderance of the evidence that Mr. Kahaian's expert testimony has an adequate foundation and will be helpful to a jury.  Counterclaim Defendants' concerns are clear fodder for cross-examination but not a basis for excluding his opinion.  *See Daubert*, 509 U.S. at 596.

**B.  Whether Mr. Kahaian's Methodology Was Reliable**

Counterclaim Defendants also argue Mr. Kahaian's methodology was unreliable.  In *Daubert*, the Supreme Court laid out four illustrative factors for evaluating the reliability of a scientific expert opinion:

(1) whether the expert's theory can be and has been tested;
(2) whether the theory has been subjected to peer review and
publication; (3) the known or potential rate of error of the
particular scientific technique; and (4) whether the technique
is generally accepted in the scientific community.

*Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1340–41

(11th Cir. 2003); *see Daubert*, 509 U.S. at 589.  These factors ask the trial

court to consider whether the reasoning stands up to expert scrutiny.  *See*

*Kumho Tire*, 526 U.S. at 152 ("[T]he objective of that requirement is to

. . . make certain that an expert, whether basing testimony upon

professional studies or personal experience, employs in the courtroom the

same level of intellectual rigor that characterizes the practice of an expert

in the relevant field.).  These factors can also be used "to evaluate the

reliability of non-scientific, experience-based testimony."  *Frazier*, 387

F.3d at 1261 (citing *Kumho Tire*, 526 U.S. at 152).  "Exactly *how*

reliability is evaluated may vary from case to case, but what remains

constant is the requirement that the trial judge evaluate the reliability

of the testimony before allowing its admission at trial."  *Id.*

As explained above, Mr. Kahaian did a before-and-after analysis,

comparing the profits Universal expected to earn if Mr. Parson had

stayed through his exclusivity agreement (but-for profits) with the profits

Universal expected to earn after Mr. Parson left (actual profits).  When an expert uses this method, "[h]is assumptions and projections must rest on 'adequate bases' and cannot be the product of mere speculation." *Zimmer*, 2018 WL 276324, at *1 (quoting *Park v. El Paso Bd. of Realtors*, 764 F.2d 1053, 1067 (5th Cir. 1985)).  Counterclaim Defendants claim Mr. Kahaian used too high a growth rate for but-for profits and too low a growth rate for actual profits.

For but-for profits, Mr. Kahaian used a 9.3% growth rate, which he borrowed from the AWEA Report, a wind energy industry publication. (Dkt. 150-1 at 4, 28.)  Counterclaim Defendants argue this was a fatal mistake because the growth rate for the wind energy industry does not determine the growth rate of wind energy transportation.  When asked about the potential disconnect between these industries, Mr. Kahaian responded, "wind energy business is going to continue to grow substantially over the next several years . . . which to me translates into additional need for transportation logistics services, of which Universal was one of the largest of the 20 logistical providers of the blades."  (Dkt. 153 at 93:16–25.)  The Court accepts his reasoning.  He also did not blindly rely on the industry report.  He verified that the 9.3% growth rate

correlated with Universal's historical growth, even if some years showed different rates. (*Id.* at 88:19–19:23.) And he also confirmed the AWEA Report relied on empirical data for its conclusion. (*Id.* at 82:16–83:7.) Given that analysis, Mr. Kahaian could rely on an industry report. *See B-K Cypress Log Homes Inc. v. Auto-Owners Ins. Co.,* No. 1:09-cv-211, 2012 WL 1933766, at *4 (N.D. Fla. May 25, 2012). The Court finds the AWEA Report provides a reliable basis for Universal's but-for growth rate. Counterclaim Defendants also argue the 9.3% growth rate is too ambitious, created in part to advertise the wind energy industry. This may be a great issue for cross-examination but does not render Mr. Kahaian's methodology unreliable.[3]

Counterclaim Defendants then argue Mr. Kahaian's actual growth rate for Universal was too low. Mr. Kahaian chose twenty percent, which he found tracked Universal's 2016–17 financial data. (Dkt. 150-1 at 28.) Much time has passed since Mr. Kahaian submitted his expert report. In fact, the entire period of Mr. Parson's exclusivity with Universal has

---

[3] Counterclaim Defendants argue the AWEA Report is hearsay. The Court finds that it is admissible under Rule 703 of the Federal Rules of Evidence, which states, "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."

passed and thus the entire period in which Universal can collect lost profits has expired.  As a result, Mr. Kahaian no longer needs to predict Universal's profits and revenues but can use Universal's actual financial information during the relevant period.   For his testimony to be admissible, Mr. Kahaian must recalculate Universal's lost profits by using Universal's financial information through the expiration of Mr. Parson's agreed exclusivity with Universal.  The Court has entered an order allowing the discovery necessary for him to do so.

## IV.   Conclusion

The Court **DENIES** Counterclaim Defendants' *Daubert* Motion to Exclude the Report and Testimony of Universal's Putative Expert Michael Kahaian (Dkt. 150).

**SO ORDERED** this 22nd day of June, 2020.

MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE